**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JANE DOE II**<br>c/o Derek E. Jokelson, Esquire<br>Jokelson Law Group, P.C.<br>230 S. Broad Street, 10th Floor<br>Philadelphia, PA 19102<br><br>       *Plaintiff,*<br><br>   v.<br><br>**SAINT JOSEPH'S UNIVERSITY**,<br>5600 West City Ave<br>Philadelphia, PA 19131<br><br>    and<br><br>**TERRI ADAMS**<br>5600 West City Ave<br>Philadelphia, PA 19131<br><br>       *Defendant*s. | CIVIL ACTION<br><br>NO. 2015 – cv – _____<br><br><br>***JURY TRIAL DEMANDED*** |

**COMPLAINT**

**I.      INTRODUCTION**

1.      This action is brought pursuant, *inter alia*, to Title IX of the Education Amendments of 1972 codified at 20 U.S.C. §1681 et seq ("**Title IX**"), and arises from a widespread and well known culture of abusive and sexually charged hazing on the women's softball team at Saint Joseph's University ("SJU" or the "University") which was known, encouraged and tolerated by the team coach, Defendant Terri Adams, and others at the University. The indifference, encouragement and toleration exhibited by the Defendants was the proximate cause of severe

sex-based harassment creating a hostile environment, assault, battery, negligent and intentional infliction of emotional distress and other tortious misconduct upon Plaintiff who was a member of the softball team. Defendants' unlawful conduct subjected Plaintiff to continued sexual and other harassment and a hostile environment and effectively denied her access to the educational benefits and opportunities on the basis of gender, all in violation of Title IX and other legal duties.

2.   This case, filed on behalf of Jane Doe II, is factually related to a separate action previously filed on behalf of a separate Plaintiff identified as Jane Doe ("**Doe I**") and captioned *Doe v. Saint Joseph's University, et al*, U. S. D. C. E. D. Pa, Civil Action No 15 – 2799 MSG (May 2015) (the "**Doe I Action**").

3.   In addition to the allegations in the Doe I Action, Plaintiff herein ( Doe II)  makes additional allegations specific to Plaintiff as well as based upon additional information which has come to light since the filing of Doe I. These additional allegations include, but are not limited to:

a.       new knowledge of improper conduct by Coach Adams with regard to her management of the team and failure to discharge SJU's duties (including those under Title IX) dating back at least five years in connection with a former student identified herein as Jane Roe who left the team due to improper conduct by Coach Adams and members of the team. Paragraphs 18 through 24 below; and

b.       harassment, retaliation and intimidation including assaultive behavior against Plaintiff herein by the team in Coach Adams' presence during a three hour bus ride to George Mason University (and while at George Mason) directly after and as a result of media coverage publically shedding light on the abusive environment at

SJU wherein Coach Adams completely failed to protect Plaintiff, again in violation of her duties, and instead improperly accused Plaintiff of being "shady" and the source of leaks to the press. paragraphs 87 through 94 below.

## II.    JURISDICTION, VENUE & JURY TRIAL DEMAND

4.    This Court's jurisdiction to adjudicate Plaintiff's civil rights claims under Title IX is predicated, *inter alia*, upon 28 U.S. C. §§ 1331 and 1343.

5.    Plaintiff invokes the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367 as her additional claims arise out of a common nucleus of operative facts.

6.    Plaintiff invokes the Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332 as Plaintiff is domiciled in a state other than Pennsylvania and Defendants are both domiciled in and residents of Pennsylvania.  The amount in controversy is in excess of $150,000, exclusive of interest and costs.

7.    Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) because the Defendants reside or maintain their principal place of business in the District, and because all claims accrued within the District.

8.    Plaintiff demands a jury trial.

## III.    PARTIES

9.    Plaintiff Jane Doe II ("**Doe II**" or "**Plaintiff**") is a 19 year old female Catholic college athlete who is a United States citizen domiciled in a state other than the Commonwealth of Pennsylvania.

10.    Defendant Saint Joseph's University ("**SJU**") is a private Catholic University which is

located in Pennsylvania and organized under the laws of Pennsylvania.

11.    Defendant Terri Adams ("**Coach Adams**") is a citizen and resident of the Commonwealth of Pennsylvania and an employee of SJU employed as the head coach of the women's softball team.

## IV.    FACTUAL BACKGROUND

12.    At all material times, SJU was receiving federal funding, as contemplated by Title IX, 20 U.S.C. § 1681, et seq.

13.    SJU implemented and executed policies and customs in regard to the events that resulted in the deprivation of Plaintiff's constitutional, statutory and common law rights.

14.    The University is responsible for ensuring that all of its employees are properly trained and supervised to perform their jobs.

15.    The University is responsible for the acts and omissions of an employee when the employee is acting within the scope, course, and authority of his or her employment, and on behalf of their employer.

16.    At times relevant herein, upon information and belief, SJU's employees identified in this Complaint were acting in the course and scope of their authority at SJU and on behalf of SJU (as well as for their own benefit and on their own behalf).

### A.    PRIOR RELEVANT CONDUCT

17.    Upon information and belief, prior to Plaintiff's matriculating at SJU, there was a widespread culture of harassment on the women's softball team including sexual conduct creating a hostile environment which was known to SJU and not properly addressed or

4

remedied by SJU in violation of Title IX.  It is believed that this misconduct was consistent with the misconduct described below and in the Complaint filed in the Doe I Action.

### 1.      Jane Roe (2010 through 2013)

18.    For instance, during the 2010-2011 school year a freshman identified herein as **Jane Roe** was being solicited by Coach Adams to join the softball team.  Coach Adams emailed this student a list of signals for her to memorize and invited the student to join the team for meetings and workouts. Roe arrived a few minutes early for the first meeting to which she was invited and noticed inappropriate physical and verbal behavior by team members in the locker room (including discussions of dildos, vibrators and nipples) being condoned by Coach Adams.  After Coach Adams introduced Roe as a new member of the team, Coach Adams started reviewing the hand signals with the team.  After demonstrating the first signal a team member asked Coach Adams whether Coach Adams was sure she had demonstrated the correct signal to which  Coach Adams responded "oh sorry" and started salaciously rubbing her nipples in circles with her tongue out in a lewd and sexually suggestive manner. This improper sexually charged conduct by Coach Adams caused the existing teammates to laugh.

19.    Several days later Roe delivered her physical/medical forms to Coach Adams.  A nearby member of the softball team then commented in a lewd, sexually suggestive and inappropriate manner, to Coach Adams with words to the effect 'oh, those are her [Roe's] physical forms? I would like to give her a physical.'  This comment was tolerated and condoned by Coach Adams who laughed in response.

20.    Throughout Roe's relatively brief interactions with Coach Adams, Coach Adams incessantly and repeatedly called her "cute" or "adorable" or words to that effect. At some point in her freshman year, Coach Adams called Roe's father stating words to the effect that "I hope I did not make [Roe] uncomfortable by calling her adorable so often, she is just so darn cute."

21.    Following the above incidents, and in the early part of the spring semester of 2011, Roe determined that the culture and environment on the SJU women's softball team was inappropriate, harassing, insulting and demeaning. Roe determined that she could not continue on the softball team. Roe informed Coach Adams and was unable to play Division I college softball as a result.

22.    Upon information and belief, despite knowledge of her own inappropriate behavior and that of team members which created a sexually charged and hostile environment, Coach Adams took no action to address or remediate such misconduct as she was obligated to do.

23.    Upon information and belief, other members of the SJU softball coaching staff and other members of the athletic department had actual knowledge of the inappropriate sexually charged misconduct on the softball team creating a hostile environment and took no action as they were obligated to do.

24.    After Roe quit the softball team in the spring semester of 2011, she was the subject of repeated harassment and retaliation by Adams who variously tried to convince her return to the softball team as a valuable asset to the team and punished her and retaliating against her for refusing to play on the softball team by stymying other softball opportunities of Roe's including depriving Roe and others she associated with from access to playing fields and equipment at SJU.

### 2.    Doe I (2013 – 2015)

25.    As set forth in the Doe I Action Complaint, Doe I matriculated at SJU in the fall of 2013 on an athletic scholarship to play on the SJU softball team.

26.    In October 2013, Doe I was subjected to an initiation week of sexually charged hazing and harassment as described in the Doe I Action Complaint.  The hazing and harassment described in the Doe I Action Complaint is similar to the hazing and harassment forced upon Doe II as set forth below.

27.    During the Doe I's initiation week in the Fall of 2013, one of the incoming freshman that year became so drunk at an initiation week party that she required emergency room treatment for alcohol poisoning.  Upon information and belief, Coach Adams accompanied this other teammate to the hospital and was aware of the multiple violations of SJU policies at that time but failed to properly further report the incident within SJU and/or failed to properly act to protect teammates, and future teammate including Plaintiff, from further violations of policy and law.

28.    In the middle of the 2013 initiation week in the Fall of 2013, the entire team was told to report  to the off campus house of upperclass members of the softball team where the team was informed that Coach Terri Adams had emailed or texted seniors on the team to tell the seniors that the "Administration" had found out about the initiation and hazing and that the initiation and hazing was suspended.

29.    Upon information and belief, Kenneth W. Krimmel, Assistant Director of Academic Services for Student-Athletes, Compliance, Office of Athletics at SJU was aware of the hazing and misconduct on the softball team in 2013 and likely before 2013.

30. Upon information and belief, despite the fact that Coach Adams and the SJU Administration were aware of the initiation and hazing occurring on the softball team, no formal investigation took place in 2013 – 2014 (or before that time) with regard to any violations of SJU policy, including the Community Standards Policy, Alcohol Policy, Policy Prohibiting Discrimination, Harassment and Retaliation; Bullying Policy; Hazing Policy or Sexual Violence Policy (which are described more fully below).

31. Upon information and belief, had a proper response been made with a proper investigation in years prior to the 2013 – 2014 school year, Plaintiff would not have been subjected to the hazing and misconduct described in this Complaint.

32. Upon information and belief, had a proper response been made with a proper investigation in the Fall of 2013 during the initiation and hazing week that year, Plaintiff would not have been subjected to any hazing and misconduct as described in this Complaint.

33. Instead of discharging her duties as an employee of SJU and reporting the hazing and misconduct, Coach Adams never put a stop to such misconduct and instead endorsed it by allowing it continue and actively engaged in such misconduct herself.  For instance, during Doe I's freshman year and thereafter, Coach Adams started calling Doe I "Sippy" and/or "Sippy Shit in Pants" explaining that Doe I was worthless and was no better than "shit in pants."  Coach Adams called Doe I these demeaning and derogatory names in front of other members of the softball team, thereby humiliating, harassing and bullying Doe I.

34. In addition there was a culture of teammates calling each other sexually charged and demeaning nicknames in Coach Adams's presence without any intervention by Coach Adams.

8

35. Following the initiation week in the Fall of 2014, Doe I continued to be victimized, harassed, demeaned and belittled by her team, often in front of Coach Adams.

36. In addition, Doe I was constantly berated about her sexual orientation by other teammates who told her that she was gay and she should come out of the closet and other language to that effect. Moreover, other teammates who befriended Doe I (eventually including Plaintiff Doe II) were called lesbians for associating with Doe I.

37. The foregoing conduct continued and worsened throughout Doe I's freshman year. She felt helpless, defenseless, worthless, demeaned, and victimized.

38. During the 2013 – 2014 school year, another underaged player on the team would frequently arrive at practice in a taxicab drunk. This misconduct was known to the coaching staff and tolerated.

39. In the Spring of 2014, a graduate assistant coach made reference to Doe I to some of the misconduct during the Fall of 2013 initiation week which confirmed Doe I's knowledge and belief that the coaches knew about the initiation misconduct and never addressed the situation.

### 3. Doe II (Plaintiff herein) (2014 – 2015)

40. In July 2013, Doe II played in a softball tournament in Florida at which time she was between her Junior and Senior years of high school. During that tournament, Plaintiff was scouted by SJU Assistant Softball Coach Gary Falasca. Coach Falasca spoke with Plaintiff and her mother informing them that SJU was interested in recruiting Plaintiff and inviting them to visit the SJU campus. During this meeting Coach Falasca spoke highly of the quality of the SJU Division I softball program including its level of play, the integrity of the team

and coaching staff as well as the Christian family values of SJU and the team.

41.     Shortly thereafter, Plaintiff visited SJU and met with Defendant Head Coach Terri Adams along with other members of the coaching staff. At various times during this visit, Coach Adams again promoted the quality of the SJU Division I softball program including its level of play and the integrity of the team and coaching staff. Coach Adams repeated several times that the student athletes and their well being were the number one priority.

42.     During a discussion held in Coach Adam's office, Coach Adams again promoted the values and integrity of the softball program.  In order to demonstrate these values, Coach Adams drew a pyramid diagram which demonstrated how family came first, then school, then softball, and finally social life. Coach Adams stressed how family oriented the SJU softball program was and contrasted the SJU program with the programs at Temple and Manhattan College by saying how 'ghetto' and 'impolite' people at Temple and Manhattan College were.

43.     Coach Adams told Plaintiff how the softball players were like her children and how much she cares for each player.  Coach Adams stated that if a player were homesick or struggling with their grades or had personal problems, Coach Adams and SJU were there to support the players. Coach Adams further informed Plaintiff that the girls on the team were very close, that they protected and took care of each other in order to get through these common struggles.

44.     Coach Adams told Plaintiff that the year Plaintiff would arrive (2014), SJU was bound to win an A10 championship because of the bond that the team had and how passionate and hungry the senior class was going to be.

45.   Coach Adams (and Assistant Coach Brook Dareff) then gave Plaintiff a tour of the locker room and facilities at SJU during which they informed Plaintiff that the education at SJU was amazing and stated that all of the programs and people at SJU were there to help the student athletes succeed in their classes. For instance, Coach Adams talked about the study hall hours, the tests from past players that she kept for future players to study from, tutoring, and how she allowed players to take off from practice during midterm and finals weeks to deal with the stress. Coach Adams stated that the softball field helped players get away from their stress and that the team was a fun and loving environment.

46.   At the conclusion of the foregoing promotion of SJU, Coach Adams on behalf of SJU made Plaintiff an offer of a full tuition scholarship and informed Plaintiff that she had a limited time period in which she had to give them a final answer as "they had other players on a waiting list".

47.   Thereafter, based upon Defendants' representations, Plaintiff verbally committed to attending SJU as a member of the softball team.

48.   After committing to attend SJU, Coach Adams would frequently call, email, and watch Plaintiff play in tournaments in the summer and fall of her high school senior year. Coach Adams would often talk to Plaintiff and Plaintiff's mother expressing how excited Coach Adams was for the upcoming season, what a wonderful team and environment existed at SJU and how much fun it was going to be.

49.   During the Fall of 2013, during Plaintiff's official campus visit as a high school senior, Plaintiff met with Dominick J. DiJulia, Vice President and Athletic Director of SJU.  Mr. DiJulia reaffirmed the positive values of SJU as well as its softball program including how

11

family oriented and amazing the athletic department was.

50. Plaintiff also met with Kenneth W. Krimmel, Assistant Director of Academic Services for Student-Athletes, Compliance, Office of Athletics at SJU. Mr. Krimmel talked about all the safety nets in place for the student athletes. Mr. Krimmel extolled the advantages of an SJU education., discussing with Plaintiff the importance of an SJU education and how a diploma from SJU was significant.

51. During this visit (while Plaintiff was still a senior in highschool), Plaintiff stayed with members of the team and watched them practice along with other recruits who would be in Plaintiff's incoming freshman class. Members of the team asked Plaintiff and the other recruits about their sexuality and religious background. The recruits were asked by team members to identify who they thought were lesbians on the team. The recruits (who were all underage) were told to go to a party at the off campus house of members of the softball team where alcohol was served.  Plaintiff was subjected to peer pressure from team members to drink and was ostracized for not drinking. The recruits were also told to lie to Coach Adams about what occurred and were told to tell Coach Adams that they played Pictionary. The following day, Plaintiff cried to her mother due to this mistreatment. Plaintiff's mother told Plaintiff that she just had to get to know the girls on the team better.

52. After this visit, Coach Adams again repeatedly contacted Plaintiff to discuss the upcoming year, promote the quality of the SJU softball team and reassure Plaintiff that SJU was a warm and welcoming environment.

53. Prior to committing to attend SJU, as well as prior to matriculating at SJU, Defendants through Coach Adams and others repeatedly promoted SJU to Plaintiff including informing

plaintiff words to the effect that:

a.     SJU was committed to the Catholic Jesuit tradition and sought to empower students by instilling Christian values including social justice, appreciation of diversity, tolerance and that the softball team operated consistent with these values. SJU's values communicated to Plaintiff in this regard were consistent with the University and Athletic Department Mission Statements described more fully herein;

b.     The softball team was a wholesome well functioning team;

c.     SJU takes care of their softball players and that Coach Adams treats the players as if they were her own children;

d.     SJU had abundance of safety nets in place for the student athletes to excel in school, and that if Plaintiff (or any athlete were having difficulties of any kind) they would have every resource of SJU available to them;

e.     Plaintiff would receive a top rated education on a Division I softball team and that Plaintiff would be well taken care of such that she would be safe, secure, have an emotionally stable and supportive environment with the full resources of SJU at her disposal.

54.     Based upon all of defendants representations and solicitations, Plaintiff decided to attend SJU based upon the strength and values of their softball program and the offer of an athletic scholarship.

55.     At no time prior to accepting the softball scholarship or matriculating to SJU did Defendants explain to Plaintiff that there was actually an existing widespread culture of harassment on the women's softball team, including sexual conduct creating a hostile environment which

was tolerated by Coach Adams, administrators and others at SJU.  Had plaintiff known this, she would not have attended SJU.

56.  As set forth more fully herein, SJU's pre-matriculation representations to Plaintiff set forth above were false and known to be false by the Defendants.

57.  Plaintiff matriculated at SJU in Philadelphia in the Fall of 2014.  She was provided either electronically and/or physically with a copy of the Adult Student Handbook attached hereto as Exhibit A (the "**Student Handbook**") and or a handbook which was substantially similar or identical.

58.  Plaintiff was also provided a copy of the Saint Joseph's University Student-Athlete Handbook 2014-2015 attached hereto as Exhibit B (the "**Athlete Handbook**"). The Athlete Handbook incorporates the Student Handbook (Exhibit B at 4) and further expounds upon SJU's policies and procedures as specifically applied to student athletes.

59.  The Student Handbook sets forth  SJU's Mission Statement which included the following:

> Saint Joseph's University is a Catholic and Jesuit university that instills in each member of its academic community: a love of learning and of the highest intellectual and professional achievement; moral discernment reflecting Christian values; and a transforming commitment to social justice. Saint Joseph's is a private Independent and Comprehensive university.
>
> The defining element of Saint Joseph's intellectual tradition experienced by all of its undergraduate students is its strong and integrative core curriculum in the liberal arts that informs their study of particular disciplines. While remaining true to that humane and formative tradition, Saint Joseph's now embraces the challenge of excellence in graduate education in both the arts and sciences and in business. Our understanding of the centuries-old Jesuit educational vision of "concern for the individual student" (cura personalis) establishes effective and rigorous teaching and learning as a primary value. Since teaching and learning in the modern academic context require research at both the undergraduate and graduate level, the

University cultivates, in students and faculty, generative scholarship that embodies free and open inquiry, and provokes imaginative thinking, aesthetic appreciation, and precise communication. As a necessary complement to intellectual achievement, we seek to illuminate the affective and ethical dimension in learning within the various disciplines at every level. Cura personalis also calls for the fullest development of the individual student's potential both inside and outside the classroom.

The Catholic character of Saint Joseph's University springs from its historical relationship with the Roman Catholic Church, and from its current embodiment of the great traditions of Catholic life and culture. For this University, Christ and the Church are sources of truth, guides and inspirations for life. Catholic values are normative, including: full respect for the freedom of conscience of each person, freedom in research and teaching according to one's discipline, and the continuous pursuit of truth, human rights, and the common good. We foster a lived awareness of the challenging and mutually enriching interaction between Christian faith and diverse contemporary culture; we seek to engage the full participation of the entire community in the University's intellectual, cultural, and spiritual life. The University's Ignatian identity derives from its founding by the Society of Jesus in 1851 and from the subsequent shaping of the University's development by the evolving world view of the Society. In ways consistent with its nature as a university, Saint Joseph's espouses the educational priorities of the Society of Jesus which include: searching for God in all things, pursuit of the greater good, the service of faith together with the promotion of justice, and effective compassion for the poor and those in need.

For the University's defining institutional ideals to matter at the regional, the national, or the international level, they need to be realized and expressed within an inclusive environment marked by trust and enriched by a diversity of ideas, cultures, and religious commitments. The contemporary Ignatian vision of educating "men and women for others" assumes a Saint Joseph's University community-students, staff, and faculty that exists as a vital cultural plurality, aware of and committed to its central identity, while yet open and welcoming to all.

The University's Ignatian identity derives from its founding by the Society of Jesus in 1851 and from the subsequent shaping of the University's development by the evolving world view of the Society. In ways consistent with its nature as a university, Saint Joseph's espouses the educational priorities of the Society of Jesus which

15

include: searching for God in all things, pursuit of the greater good, the service of faith together with the promotion of justice, and effective compassion for the poor and those in need.

For the University's defining institutional ideals to matter at the regional, the national, or the international level, they need to be realized and expressed within an inclusive environment marked by trust and enriched by a diversity of ideas, cultures, and religious commitments. The contemporary Ignatian vision of educating "men and women for others" assumes a Saint Joseph's University community-students, staff, and faculty that exists as a vital cultural plurality, aware of and committed to its central identity, while yet open and welcoming to all.

Exhibit A at 7 – 8.

60.     The Athlete Handbook provides a further mission statement of the SJU Athletic Department

as follows:

The Mission of the Athletic Department at Saint Joseph's University reflects the Ignatian Mission of the University by using the programs within Athletics as a way of developing the whole person and preparing men and women for others. The Athletic Department, therefore, strives

- To educate the whole person by complementing the academic experience with athletic and recreational programs and activities outside the classroom.

- To create an environment for personal growth through openness, respect, and concern for others.

- To communicate the values of community and family through teamwork and sportsmanship.

- To provide opportunities for students to learn self-discipline, responsibility, decision-making and the attainment of goals.

- To provide opportunities for students to participate and compete in a first-class manner.

- To provide equitable opportunities for all students and

16

staff, including women and minorities

- To advance the University regionally and nationally through intercollegiate athletics, especially the most highly visible sports.

Exhibit B at 3.

61. The Student Handbook has other sections pertinent to this litigation including the following:

> TITLE IX COORDINATOR
> Title IX prohibits discrimination on the basis of sex in education programs or activities operated by recipients of Federal financial assistance. Saint Joseph's University is required to uphold Title IX in all educational programs. If the institution knows or reasonably should know about harassment (including sexual violence) that creates a hostile environment, Title IX requires immediate action to: eliminate the harassment; prevent its recurrence and address its effects.

Exhibit A at 22.

> UNIVERSITY POLICIES, REGULATIONS, & GUIDELINES
> ... To support the continuation of a positive, safe and educational setting, the University has adopted an array of policies and regulations. Should any member of the University community violate established policy, the University has in place processes intended to educate which includes in some instances the need to discipline the violator, and thus deter further violations by that and/or other individuals. This handbook includes most policies in full, as well as some excerpts from more lengthy policies. ...

*Id.* at 23.

62. One policy described in the Student Handbook was the Community Standards Policy which stated in part as follows:

> **COMMUNITY STANDARDS**
> Approved by University Council: April, 2008; Revised July 2010, July 2011, July 2012, August 2013
>
> The Mission Statement of Saint Joseph's University shapes the

17

responsibilities and privileges afforded to members of the University community. These Community Standards are designed to foster a community conducive to achieving the mission of the University. Rooted in the Catholic Jesuit tradition, Saint Joseph's University aims to create and to sustain an educational environment that facilitates students' academic, personal, and spiritual development. At the core of these values is the Ignatian tradition of "cura personalis," which affirms the goodness, the worth and the dignity of every human being. Students affirm this commitment through adherence to the standards of conduct established within our community.

***

**What Conduct Would Violate the Community Standards?**

Any behavior that violates standards set forth in the Student Handbook, the University Catalog, approved organizational constitutions and by-laws, room/board contracts and other University bulletins, as well as behavior that fails to meet the four University Expectations outlined above may violate the Community Standards. Specifically, any student or student organization alleged to have committed or alleged to have attempted to commit any of the following acts is subject to the Community Standards process outlined in this document.

This is not an all-inclusive list.

1. Physically abusing or threatening another person, or engaging in any other conduct that threatens or endangers the health or safety of another person.

2. Engaging in sexual violence. This includes dating violence, domestic violence, and stalking (see Sexual Violence Policy).

3. Hazing (see Policy on Hazing).

5. Violating the alcohol policy (see Alcohol Policy).

8. Discriminating, harassing, or retaliating against another person (see Policy Prohibiting Discrimination, Harassment and Retaliation).

9. Bullying another person (see Bullying Policy).

13. Engaging in lewd, obscene, or indecent behavior, including making lewd, obscene, or indecent gestures.

14. Violating the sexual activity policy (see Sexual Activity Policy).

16. Making, distributing, or publishing a media recording of any person without that person's consent and/or prior knowledge (e.g., audio, picture, video).

26. Violating any federal, state, or local law or any University policy, rule, or regulation.

Exhibit A at 23 – 26.

For Title IX violations, the University will take specific steps to prevent reoccurrences of any harassment and to correct discriminatory effects on the complainant and others, if appropriate.

*Id.* at 36.

63.    Another policy described in the Student Handbook was the Alcohol Policy which stated

in part as follows:

ALCOHOL POLICY
Saint Joseph's policy on the use of alcohol combines observance of state law, protection of the overall community and reduction of high risk behavior by students. Consistent with our Catholic, Jesuit mission, the alcohol policy is guided by the care and concern for the individual person and the welfare of other students. It should be understood that the University in no way is a co-sponsor to off campus alcoholic events unless it has specifically stated this prior to the event. To reflect its commitment to alcohol awareness, the University calls upon key individuals and departments to educate the University community on the dangers of alcohol abuse and to enforce policies on alcohol use

Exhibit A at 46.  See also the Athlete Handbook, Exhibit B at 12. The Alcohol Policy as set

forth in the Student Handbook goes on to state:

Examples of alcohol violations include, but are not limited to:

1. underage possession and/or consumption of alcohol;

2. knowingly furnishing, transporting, and/or allowing minors to consume alcohol;

3. use of alcohol resulting in involuntary, erratic and/or abusive

behavior;

5. involvement in the high risk use of alcohol;

6. exceptional number of persons observed in a residence on campus or off campus when an open container of alcohol is present;

7. open container of alcohol in public area.

Students are expected to immediately report conduct or activity which poses a danger to the community or its members.

For example, all students are expected to seek appropriate assistance for themselves or others in situations where help is needed to ensure proper care of a person who is significantly intoxicated or under the influence of drugs. Students should not hesitate to seek help because of fear of disciplinary action.

In most circumstances, the help seeker and the student in need will not be charged with a policy violation under the University Community Standards system. Although students may be required to meet with a University official regarding the incident, Saint Joseph's University will support and encourage this behavior by treating it as a health and safety matter, not as a disciplinary incident. **In rare circumstances, such as cases of repeated, flagrant, or serious violations of the Community Standards (e.g., bodily harm, sexual violence, physical or verbal abuse or harassment, distribution of drugs, hazing, theft) or violations that caused the harm to another person requiring emergency response, a student's behavior may be considered more than a health and safety matter**.

Exhibit A at 47 (emphasis supplied).

64.   Another policy described in the Student Handbook was the Bullying Policy which stated in part as follows:

BULLYING POLICY
Bullying behavior creates feelings of defenselessness, fear, and injustice and undermines a person's dignity. The University strictly prohibits bullying. Bullying is severe, pervasive, or persistent actions of a person (or group of persons) directed towards another person or group of persons in a severe, pervasive, or persistent manner, which are intended to hurt, intimidate, degrade, humiliate, and/or undermine.

Bullying is also engaging in any course of conduct that is likely to seriously annoy or alarm another person (or group of persons) in a severe, pervasive, or persistent manner. Bullying can take many forms, including, but not limited to, verbal (teasing, threatening, name-calling), social (spreading rumors, intentionally isolating), and physical (hitting, punching, shoving). Bullying can be in person, through actions, and/or through electronic communication. Bullying creates a risk to the health or safety of the University community. Anyone found to engage in bullying behavior may be subject to disciplinary action.

Exhibit A at 48 – 49.

65.    Another policy described in the Student Handbook was the Policy Prohibiting Discrimination, Harassment and Retaliation which stated in part as follows:

PROHIBITING DISCRIMINATION, HARASSMENT AND RETALIATION

**I. Preface**

In keeping with Saint Joseph's University's ("Saint Joseph's" or "University") mission as a Catholic, Jesuit University and a formal and informal community of faith, we must hold ourselves to a high standard of respect and fairness in our personal conduct and interactions. As such a community, we espouse that each individual is entitled to certain basic protections. These protections include, but are not limited to:

- Freedom from unlawful discrimination, harassment, and retaliation of any type.

- Freedom to be heard without fear of reprisal.

- The expectation of confidentiality to the extent that is possible.

- The assurance of a prompt and equitable investigation and resolution of all allegations of discrimination, harassment or retaliation.

- During a formal process, the opportunity of the respondent to be presented with all relevant information in a timely manner, and to respond.

21

At the same time, the University is committed to the principles of academic freedom. Vigorous discussion and debate, even of controversial matters, are an integral part of the educational enterprise.

## II. Purpose

As a Catholic, Jesuit University, Saint Joseph's is committed to the just and respectful treatment of students, faculty, and staff. To this end, Saint Joseph's prohibits unlawful discrimination against, and harassment of, its employees, students, or applicants for employment or admission on the basis of any characteristic protected by state or federal law. The prohibition extends to discrimination, harassment and retaliation by third parties visiting campus or participating in University-sponsored activities (including volunteers; visitors; trustees; and, independent contractors).

The University's Policy Prohibiting Discrimination, Harassment and Retaliation ("Policy") is designed to educate members of the University community about discrimination, harassment and retaliation and provide clear procedures when a violation of this Policy occurs. It is the University's hope that through continued education, and appropriate action upon receipt of reports and complaints of conduct that may be a violation of the Policy, the University can eliminate discrimination, harassment and retaliation within the Saint Joseph's community.

## III. Definitions

A. **Protected Categories**: The law prohibits discrimination and harassment on the basis of sex/gender, race, age of 40 or over, color, religion, national origin, ethnic origin, sexual orientation, disability, marital status, and military and military veteran status.

B. **Discrimination**: Unlawful discrimination occurs when an individual is treated less favorably because he or she is a member of a protected category. Discrimination adversely affects a person's employment or education; it includes the denial of academic or employment opportunities, and differentiates in terms and conditions of employment on the basis of membership in a protected class.

C. **Harassment**: Harassment means any unwelcomed, unsolicited and offensive conduct that tends to injure, degrade, disgrace or show

22

hostility toward a person because of his or her membership in a class of persons protected by law. For purposes of applying this policy, "sexual" harassment includes conduct that is of a sexual nature or related to a person's gender and may include persons of the same sex. Harassment of any kind need not be intentional to be prohibited under this policy. Harassment on the basis of one's sexual orientation can also constitute discrimination on the basis of sex. For an incident to constitute harassment, it must be offensive to a reasonable person. Sexual violence constitutes a form of sexual harassment.

D. **Sexual Violence**: Sexual violence, including but not limited to physical forms of sexual assault (e.g., rape, sexual assault, sexual battery, and sexual coercion), is an especially serious form of both discrimination and harassment. As such, special procedures for complaint, investigation and resolution apply. See Policy on Sexual Violence.

E. **Retaliation**: Adverse action taken against a person because of his or her participation in a discrimination or harassment proceeding (e.g., as complainant or as witness).

F. **Examples of Conduct That Can Constitute Discrimination or Harassment**

1. Examples of unacceptably discriminatory conduct include decisions based on stereotypes or assumptions about the abilities, traits, or performance of individuals because of his or her membership in a category protected by law.

2. Conduct that can constitute harassment includes, but is not limited to:

(a.) Epithets, slurs, negative stereotyping, or threatening, intimidating or hostile acts that relate to the Protected Categories listed in Section A above;

(b.) Placing on walls, bulletin boards, email, or elsewhere on the University's premises graphic material that shows hostility or aversion to an individual or group that relate to the Protected Categories listed in Section A above);

©.) Sexually explicit, graphic, abusive, degrading, intimidating, or offensive jokes, comments, remarks or

23

gestures;

(d.) Sexual advances, propositions, flirtations, requests or pressure of any kind for sexual favors;

(e.) Physical contact or intimidation.

**IV. Processing Discrimination, Harassment and Retaliation Reports and Complaints**

**A. General Provisions**

\*\*\*

2. **Reports and complaints of discrimination and harassment should be made as soon as possible after the incident(s) occurs. All reports and complaints will be investigated promptly and appropriate action will be taken as expeditiously as possible under the circumstances presented**. The University will respect the privacy of the complainant, the respondent, and the witnesses, if any, in a manner consistent with the University's obligations (legal or under this Policy) to investigate the matter, protect the individuals involved, take appropriate remedial action, and comply with any discovery or disclosure obligations required by law. This means that, although confidentiality will be respected, it cannot be guaranteed.

3. **The University may investigate a report or complaint of discrimination or harassment regardless of whether the complaining party desires the University to pursue the report or complaint, if the University has cause to believe that the action reported or complained of constitutes a violation of this Policy, breach of applicable law or a threat to the University community**.

4. **All** students and **employees should report any discrimination or harassment, experienced by themselves or another, to the appropriate University officer: Title IX Coordinator or EEO/AA Officer (see Section B below). No student or employee should assume that the University already knows about a particular situation or event**.

5. **Retaliation: The University prohibits retaliation against any individual who complains of a violation of this Policy or assists in providing information about a complaint of discrimination**, including complaints of sexual, racial or other unlawful harassment.

24

Exhibit A at 63 – 66 (emphasis supplied).

66.    The Policy Prohibiting Discrimination, Harassment and Retaliation was also restated in

the Athlete Handbook (Exhibit B) with some additional pertinent language as follows:

Persons Covered:
**This policy prohibits harassment toward any member of the SJU community** – faculty, students, administration, professional and staff, including union members. When the complainant and the respondent are both students, the existing procedures for Community Standards violations will be followed.

Definition of Harassment:
Harassment is unwelcome severe, pervasive or persistent verbal or physical conduct, directed at an individual based upon race, age of 40 or over, color, religion, national origin, ethnic origin, sex/gender, sexual orientation, disability, marital status, military leave, veteran status and any other status protected by law, which unreasonably disrupts or interferes with another's academic or work performance, or which creates an intimidating, offensive or hostile environment. Examples of unacceptable conduct include the use of insulting epithets, racial or ethnic slurs or nicknames, the display of insulting or offensive cartoons, pictures, slogans or symbols, intimidation through physical acts or threats of violence or other conduct that is so objectively offensive as to alter the conditions of the victim's academic experience or employment.

**Harassment based on sex/gender includes** unwelcome sexual advances, requests for sexual favors, and other communication (oral or written, including electronic mail) or physical behavior of a sexual nature when (a) submitting to that conduct is explicitly or implicitly a term or condition of employment or academic standing; (b) submitting or refusing to submit to that conduct is used as a basis for any decision affecting an individual's employment or academic standing; or © **that conduct has the purpose or effect of creating an intimidating, hostile or offensive working or academic environment**. Sexual harassment covers harassment by men toward women, women toward men, men toward men, and

25

women toward women.

Exhibit B at 10 – 11 (emphasis supplied).

67. Another policy described in the Student Handbook was the Policy on Hazing which

stated in part as follows:

> POLICY ON HAZING
> Hazing is defined as "any action or situation created intentionally, whether on or off campus premises, to produce mental or physical discomfort, embarrassment, harassment, or ridicule." Saint Joseph's University prohibits all forms of hazing. The Anti-Hazing Law of Pennsylvania states that any person who causes or participates in hazing commits a misdemeanor of the third degree. It also includes the willful destruction or removal of public or private property in its definition of hazing. Individuals found responsible of hazing may be fined, placed on probation, suspended or dismissed. Likewise, organizations, clubs and teams may be fined, placed on probation or disbanded. Other sanctions also may be appropriately issued. Aside from the legal aspect of hazing, the University believes that hazing is contrary to the Christian teaching of human dignity and contradicts an environment of friendship, maturity and charity within its collegiate community.

Exhibit A at 79 – 80. This Policy on Hazing was also stated in the Athlete Handbook,

Exhibit B at 9 – 10.

68. Another policy described in the Student Handbook was the Sexual Violence Policy which

stated in part as follows:

> SEXUAL VIOLENCE POLICY
> **A. Purpose**
> ***
> Saint Joseph's University ("Saint Joseph's" or "University") is committed to providing an institutional environment where all persons may pursue their studies, careers, duties, and activities in an atmosphere free of threat of sexual violence. Sexual harassment of students, employees and any member of Saint Joseph's University community interferes with the expectation that students and employees will learn and work in an environment that is free from discrimination. Sexual violence, as defined by the University, may also

26

constitute a crime.

### B. Policy

The University does not tolerate Sexual Violence on its campus, at University-sponsored events, or off-campus, by any member of the Saint Joseph's community (faculty, students, administrators, staff including union members, and volunteers). Conduct that is determined to constitute Sexual Violence is not only a violation of the Policy and reprehensible in any context, but it is also a matter of particular concern in an academic community in which students, faculty, staff, volunteers and visitors are connected by strong bonds of dependence and trust. As such, all members of the community are expected to report acts of Sexual Violence.

In addition to University action, a member of the Saint Joseph's community who has violated this Policy (the respondent) may be prosecuted under applicable criminal statutes of the location where the alleged offense occurred. S/he will be subject to internal University investigative and/or disciplinary proceedings regardless and independent of any criminal process.

\*\*\*

### C. Sexual Violence

The Office for Civil Rights (OCR) states that Sexual Violence includes rape, sexual assault, sexual battery, and sexual coercion (Ali, Dear Colleague Letter, 2011, pp. 1-2).

- Sexual intercourse without consent is rape.
- Sexual contact without consent is sexual assault.
- The touching of a person in an intimate part of the body without consent is sexual battery.
- Subjecting a person to sexual contact as a result of the use of physical or psychological pressure or threats, or the consumption of alcohol or drugs without consent is sexual coercion.

\*\*\*

### D. University Response When There is a Report of a Sexual Violence

The goal of the University's response is to offer support services to the complainant and respondent(s), while seeking to provide a safe educational and working environment. To this end, the University will take steps to prevent Sexual Violence from occurring through prevention and education. However, when such conduct occurs, the University will take all necessary and reasonable steps to stop the alleged conduct and provide support to the complainant, the

respondent, and, as necessary, to other members of the University community, at the time the assault is reported, during the investigation process and afterward.

Exhibit A at 85 – 88. See also the Athlete Handbook, Exhibit B, at 12 – 13 (stating most of the above).

69. After arriving on campus as a freshman, Plaintiff was informed by upperclass members of the softball team that there was an annual initiation and hazing of new freshman softball players.

70. In or about the Fall of 2014, Plaintiff was subjected to the initiation and hazing on the softball team in a week long hazing ritual (which upon information and belief had been repeated over the course of many years with the knowledge of employees of SJU including its softball coaching staff).

71. As set forth more fully below, for a period of many years, upperclass members of the softball team would commence the week long hazing ritual by, *inter alia*, delivering a letter to the freshman players purported from the upperclass members (the "**Initiation Letter**") to each freshman filled with inappropriate sexually charged harassment and designed to terrorize and intimidate the new members of the team explaining they were "scum" and "low level swine" who must endure the coming harassment in order to be considered actual members of the team. Plaintiff was delivered a version of this letter which was either identical to the language below or substantially identical:

> **([Name of upperclass team member 1 redacted])**: Freshmeat, you may have thought that you were a part of this team from the moment you walked onto the field. THAT IS NOT TRUE!! You are scum, low level swine, who only got a glimpse of this team from the outside. This is your deliverance week, a time to realize your place, the lowest rung on the totem pole! Remember that and **never forget it.** This week is

28

time to show respect to your upperclassmen. You are not on this team just yet. You must make it through this week in order to fully understand the bond we have as teammates. I licked [Head Coach] Terri's FUPA [Fat Upper Pussy Area]!!

**([Name of upperclass team member 2 redacted])**: This week will not be easy. There are rules and regulations you must follow. If they are not followed there will be dire consequences. This letter is yours as a group. It is to be shared but never lost! Someone must have it with them at all times. If you so not, the entire class suffers. I am turned on by [Assistant Coach] Brooke [Darreff]'s sexy chicken legs!

**([Name of upperclass team member 3 redacted])**: Some general rules that must be followed by all...never allow anyone in an authoritative position in the university of your friends know what you are doing or why you are doing it. This is between the softball team and the softball team only!! If you break this trust you will suffer the worst of all consequences. [Head Coach] Terri has sexy facial hair!

**([Name of upperclass team member 4 redacted])**: At the end of the week you will be rewarded according to your cooperation and participation during the week. As a class you are expected to create an original dance to song "Wannabe" by the Spice Girls!! You have a lot to live up to; expectations are very high so you better practice. You will perform this dance on Friday night as a group, in full costume. I love doing DROM [Dynamic Range of Motion exercises] naked!

**([Name of upperclass team member 5 redacted])**: Each of you is going to show us your true self this week based off of your Spice Hawk Identity. It is your job to figure out which spice you are; Sporty Puritan Hawk, Posh Clueless Hawk, Ginger "____" Hawk, Baby Chatterbox Hawk, and Scary Frisky Hawk. Your costumes for Friday must be **CREATIVE** and reflect the spice hawk each of you represent! Lick a Dick!

**([Name of upperclass team member 6 redacted])**: You are NOT ALLOWED to use ANY form of social media (including Instagram, Twitter, or Facebook), WE WILL BE WATCHING!  In addition to the rules in your personal letters that you will be receiving, as a group you are expected to have dinner together every night. You will sit together and no one else will sit with you and you WILL be checked on by an upperclassman. I'm an ass clown!!!

**([Name of upperclass team member 7 redacted])**: You are

expected to be in your personal dorm room every night of the week by 8:00pm. There are activities every night of the week so plan accordingly. You will received a phone call from an upperclassman with that night's activities! You must get ALL of your study hall hours done for the week and get your homework done early! I like to twist titties!

**([Name of upperclass team member 8 redacted])**: You are to dress according to what your upperclassmen specify, in your separate letters, but you are NOT to show up to any softball related event in the required attire, so make sure you have a change of clothing on you at all times. I get moist at the sight of [assistant Coach] Gary [Falasca]'s mustache!

**([Name of upperclass team member 9 redacted])**: There will be NO DRINKING or GOING out this week. You will be very busy and we want to make sure you're well rested for what we have in store. Make sure you take care of all your other responsibilities, school, softball, family, so that you can enjoy everything this week has to offer. Any mishaps will be documented and used against you on a further date. I queef during squats!

72. During the week long hazing period in the Fall of 2014, Plaintiff along with other freshman members of the softball team were forced to undergo hazing in violation of numerous SJU policies including those described above. The conduct directed at Plaintiff and her freshman teammates included the following:

a. Being blindfolded and then forced to touch the buttocks of other players. One of the buttocks plaintiff was forced to touch was naked and covered in mayonnaise. This demeaning forced touching of a naked mayonnaise covered buttocks was video taped without Plaintiff's consent and then electronically shared via social media amongst the team members and possibly others;

b. Being forced to demonstrate sexual positions on another freshman player including another player putting her face in Plaintiff's crotch and simulating sex from behind

in a 'doggie style' and 69 position;

c.   Being forced to give a lap dance on a senior member of the softball team;

d.   Being forced to answer sexually charged questions in a group setting including, but not limited to: whether she was a virgin; whether she watches pornography, whether she was the dominant person in her sexual encounters;  whether she had received anal sex; whether she was a lesbian;  to describe awkward sexual encounters; her "body count" (meaning the number of sexual partners she has had); and to describe her first time having intercourse.

e.   Being forced to perform a sexually explicit song titled "Or Nah" by a band called *The Weekend* which was video taped without her permission and then shared with an unknown number of other members of the team (and possibly others) *via* Snapchat, an internet based social media application. This song contains the following obscene, demeaning, sexually degrading lyrics (which is just the first verse of a multi verse song):

> Do you like the way I flick my tongue or nah?
> You can ride my face until you dripping cum
> Can you lick the tip then throat the dick or nah?
> Can you let me stretch that pussy out or nah?
> I'm not the type to call you back tomorrow
> But the way you wrappin 'round me is a prob
> Ain't nobody tryna save ya
> Baby, get that paper
> Probably got a lot of other bitches owe you favors
> Pussy so good, I had to save that shit for later
> Took her to the kitchen, fucked her right there on the table
> She repping XO to the death, I'm tryna make these bitches sweat
> I'm tryna keep that pussy wet, I'm tryna fuck her and her friends

31

f.      Being forced in a group setting in front of members of the softball team, members of the baseball team and other members of the SJU student community, to place condoms on one or more bananas placed between her legs in the groin area to simulate having a penis;

g.      Being forced to call an upper class member of the softball team each night to sing her a lullaby;

h.      Being forced to drink alcohol, including Jell-O shots, despite the fact that she was a minor;

i.      Being forced to simulate sexual intercourse by humping a wall every time a certain song was played;

j.      Being instructed not to look directly at upperclass members of the softball team she encountered on campus;

k.      Being instructed and forced to call upperclass members of the softball team by nicknames (including sexually suggestive nicknames such as 'pornstar princess') and performing physical acts (including simulating oral sex on a male). Freshman members of the team were given strikes if they failed to use the correct nickname or perform the correct physical act and were told that the freshman with the most strikes at the end of the week would be punished.

l.      Being locked in a pitch black room at the off campus house of upperclass members of the softball team;

m.      Being forced by a former SJU softball player (who had graduated in 2014 and went on to work at another local university) to

      i.        walk and crawl around the track linking arms at night in the freezing cold multiple times; and

      ii.       Be transported in the back of a van and told to drink a baby bottle of liquid comprised of alcohol and various items from the kitchen cabinets, such as ketchup, mustard, mayonnaise, etc. (with the further threat that they would be locked into the van until each one of them drank the liquid);

n.      Being forced to buy condoms;

o.      Being forced to repeat a chant about Coach Adams including the words "suck my yahoo"

p.      Being forced to clean the off campus house of upperclass members of the softball team including being forced to clean the cats' litter box despite the fact that Plaintiff informed the upperclass members of the team that she was allergic to cats (and as a result of which plaintiff suffered breathing problems)

q.      Being forced to stand outside in the freezing cold for at least an hour;

r.      Being forced to attend mass late at night and told to pray to God for forgiveness for all of their sexual transgressions;

s.      Being forced to name all the teams in the Atlantic 10 Conference and being punished for making any mistakes by being forced to perform, planks, pushups and jumping jacks in the middle of Church Road with traffic;

t.      Being forced to dress as a male;

u.      Being forced to watch another member of the team perform a lap dance on a team member;

v. Witnessing a team member being forced to call upperclass members of the team each night and ask sexual questions such as how to perform oral sex;

w. Being assaulted by being pushed and checked into walls during a scavenger hunt;

x. Witnessing another freshman be punished by being forced to stand in a corner and face the wall for an extended period of time;

y. Witnessing other freshman being forced to mock the coaching staff;

z. Being locked in a bathroom and made to memorize a set of rules, then being yelled at when she forgot any rule and forced to take a jell-O shot with alcohol; and

aa. Being otherwise belittled and demeaned by upperclass members of the softball team in a private and a group setting;

73. During this initiation week in the Fall of 2014, Plaintiff refused to engage in certain other activities but was forced to witness her fellow freshman teammates engage in these activities including:

a. Being forced to pretend they were receiving an orgasm from Coach Terri Adams;

b. Being forced to simulate oral sex on a wine bottle held between an upperclassman's legs to simulate a penis.

74. During the initiation week in the Fall of 2014, a sophomore was required by Coach Adams to give a PowerPoint presentation on alcohol consumption to the entire team and the coaching staff due to this students over-consumption during the prior year's initiation week. Coach Adams told Plaintiff how out of control the prior year's numerous events during the initiation had been and that this student's PowerPoint presentation was part of her punishment from the prior year.

75. During the initiation week in the Fall of 2014, and at a seminar including all student athletes, Kenneth W. Krimmel, Assistant Director of Academic Services for Student-Athletes, Compliance, Office of Athletics at SJU, noticed that members of the softball team were wearing odd or inappropriate clothing as part of the hazing on the softball team and commented to another freshman member of team in Plaintiff's presence words to the effect that 'this was the kind of stuff that got the team in trouble last year.'

76. The day following the comment by Mr. Krimmel, upperclass members of the softball team yelled and reprimanded the freshman members of the team informing them that Coach Adams had texted the team captain (a senior) about the hazing telling the team captain to 'cut the shit out' or words to that effect and reprimanding the freshman for having allegedly had their parents complain to the administration about the hazing on the team. The hazing continued however.

77. During the 2014 – 2015 year, Plaintiff was repeatedly bullied by upper class members of the softball team who would tell Plaintiff words to the effect that she was worthless and not physically or mentally fit. One senior member of the team threatened Plaintiff that she would shove a ball down Plaintiff's throat.

78. Due to Plaintiff's youthful looks, other players on the team would taunt her about her physical development and make comments like "have you even got your period yet."

79. Plaintiff was also repeatedly called a lesbian for associating with Doe I.

80. Upon information and belief, the coaching staff including Coach Adams was well aware of the bullying, harassment and intimidation of Plaintiff and failed to intervene and instead endorsed and tolerated such misconduct.

81. For instance, Plaintiff witnessed Coach Adams making sexually or otherwise inappropriate remarks to players such as calling players "biblically dirty", threatening to "rip" players "heads off and shit down [their] necks," and discussing her sex life with her husband.

82. Plaintiff also witnessed other players and Coach Brooke Dareff mock Doe I.

83. At no time did Coach Adams or anyone else at SJU initiate an investigation pursuant to SJU's written policies or otherwise act to protect Plaintiff or other similarly situated teammates.

84. Instead, when Plaintiff approached Coach Adams to describe some of the difficulties Plaintiff was having with other players on the team, Coach Adams called her "shady" meaning that she was untrustworthy and Coach Adams refused to listen to what Plaintiff had to say.

85. As a result of the abusive harassment by the SJU softball team (both during the freshman week initiation and thereafter), Plaintiff was extremely stressed, was often reduced to tears and her academic performance suffered.

86. Doe I's mother spoke with Coach Adams in or about January 2015 in a lengthy meeting lasting 2 to 3 hours or more. Coach Adams told Doe I's mother words to the effect that Coach Adams would look out for misconduct with regard to Doe I and that things would get better. However, Coach Adams did nothing and the situation only continued to worsen for Doe I. This continued inactivity meant a continuation of the sexually charged abusive and improper hazing for all freshmen on the team including Plaintiff.

87. In the Spring of 2015, there began to be news reports of the hazing and misconduct on the softball team. Teammates and coaches assumed Doe I was the source of these reports and

36

Doe I began to be retaliated against by members of the team who made threatening comments to her, including threats that members of the team would rip her head off and shove a softball down her throat. Plaintiff was further scared of the situation on her own behalf.

88.   On or about April 2, 2015, the local ABC news affiliate, Channel 6, aired a news report disclosing the accusations of hazing which described and depicted the Initiation Letter reproduced above. At or about that time, one or more news crews arrived on the SJU campus just as the softball team and coaches were boarding a bus to travel to George Mason University in Virginia, approximately 3 hours away.

89.   Upon boarding the bus, Assistant Coach Gary Falasca also told team members that the media had found out about the hazing because their "parents had big mouths and need to learn to keep their fucking mouths shut" or words to that effect.

90.   On the bus trip to George Mason University other players accused Plaintiff of texting with Doe I's mother, supplying Doe I's mother with a copy of the initiation letter quoted above, and helping bring the hazing to light. Teammates threatened to fight Plaintiff and to 'rip [her] f[-]ing phone out of [her] hands" to prove she had been communicating with Doe I's mother. Plaintiff was assaulted on the bus when another teammate slammed a seat back into her as retaliation. Teammates called her a liar, a mole, a rat, and sexually charged abusive names. Teammates threatened to physically harm Plaintiff. Coach Adams and other employees and agents of SJU were on this bus trip which lasted approximately three hours and failed to intervene, protect Plaintiff or assist Plaintiff in any way. Instead they allowed the improper, abusive and bullying conduct to continue in violation of their duties under law

and under SJU's own written policies.

91.  Upon arriving in Virginia, the team stayed at a hotel.  The following morning on April 3, 2015, Plaintiff was approached on the hotel elevator by two upperclass members of the softball team who verbally assaulted Plaintiff calling her inappropriate sexually suggestive names.  Outside the elevator, and behind Plaintiff's back she overheard these teammate state words to the effect that they wanted to "fuck her up" and "beat the shit out of her."

92.  That morning, Plaintiff was again confronted by other teammates who again called her a liar, and sexually charged abusive names.  At one point during the pre-game practice, upperclass members of the team stole Plaintiff's mobile phone to search for evidence of Plaintiff communicating with Doe I's mother.

93.  Plaintiff retreated to the bathroom during the pre-game practice in tears. A group of teammates followed Plaintiff into the bathroom and continued to harass her calling her a liar and accusing Plaintiff of being responsible for leaking information about the abusive and harassing conduct on the team. After the pre-game practice, Plaintiff was sitting in the dugout obviously distraught.  Coach Adams asked Plaintiff to go to the bathroom with her to discuss why Plaintiff was crying.  Plaintiff explained the situation and Coach Adams again told Plaintiff numerous times that she was "shady" and that Plaintiff was overreacting. Coach Adams told Plaintiff she was being irrational and stated in an accusative tone words to the effect that "well, obviously one of the freshman are behind it so who is it if its not you?"

94.  Plaintiff stayed in the bathroom and called her parents who drove over six (6) hours to Virginia and picked Plaintiff up. From that point forward, Plaintiff no longer practiced or

played with the SJU softball team.

95. Upon information and belief, during the course of the ensuing investigation, Coach Adams actively impeded the investigation by informing the players on the team to "plead the fifth while being investigated" and that "this kind of drama happened last year and nothing will happen," or words to that effect.

96. During the course of the investigation, one of the upperclass softball players wrote an open letter of apology to the SJU community at large and admitted that the initiation week described above was a long standing tradition of the SJU softball team enacted her freshman year (2012-2013) and which she understood at the time had been enacted in previous years. By way of example, this upperclass member of the team also admitted that the harassing Initiation Letter (described and reproduced above) had been handed down for many years amongst upperclass softball team members for use in the hazing during initiation week:

> Lastly, the letter given to the freshmen. Nobody on this team wrote that letter, it has been passed down for years (I have no idea how many). One of the traditions was to pass on that letter to each freshmen class. Yes, that letter has some mean things in it that people could have taken the wrong way ...

97. Plaintiff has been forced to withdraw from SJU and her softball scholarship at SJU.

98. Prior to being picked up by her parents in Virginia, and while Plaintiff was being victimized by her teammates and the Defendants' misconduct, Defendants failed to provide Plaintiff with the academic, athletic, mental health and other supportive services which they had claimed were available and which they were responsible to provide. Defendants also knowingly failed to implement or enforce their own policies purportedly designed to protect persons in Plaintiff's position and instead endorsed and supported such victimizing

misconduct.

99. Prior to the Spring of 2015, and while Plaintiff was being victimized by her teammates and the Defendants' misconduct, Defendants failed to intervene and instead condoned the misconduct which they knew of.

100. Plaintiff has suffered harm including, but not limited to:

a. Mental and emotional harm requiring medication and treatment;

b. Fear for her safety;

c. Suffering the dehumanizing effects of this type of hazing and bullying including feelings of worthlessness and loss of a positive college experience;

d. Harm to her past academic performance and future academic capacity;

e. Feeling that she must leave SJU for her physical and mental well being despite being on a softball scholarship;

f. Having to quit the softball team;

g. An impaired softball career;

h. Having to leave SJU and now having to pursue her academic options elsewhere;

i. Denial of equal educational opportunities;

j. Denial of access to the full benefit and opportunity of her education at SJU.

101. Plaintiff seeks all available compensatory and punitive damages.

102. Plaintiff further seeks attorneys fees and litigation costs including all fees and costs as may be allowed under 42 U.S.C. § 1988, 28 U.S.C. § 1920 and Federal Rule of Civil Procedure 54.

## COUNT I
## VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972

103. The foregoing and subsequent paragraphs are incorporated by reference as though set forth at length.

104. The Defendants' acts, omissions, policies and customs resulted in the sexual harassment, harassment, a hostile environment based upon sexual misconduct, assault, battery, intentional infliction of emotional distress and other misconduct upon Plaintiff. By way of example, SJU and Coach Adams fostered, knew of and condoned — for a period of years — a culture of pervasive sexual harassment on the women's softball team in violation of its own stated policies and which it knew to be harmful to its student athletes.

105. Plaintiff was denied equal educational opportunities in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§1681-1688.

106. Plaintiff was denied access to the full benefit and opportunity of her education at SJU in violation of Title IX.

107. By its actions and inactions before and after the misconduct described in the Complaint, Defendant SJU acted with deliberate indifference to the rights of Plaintiff and other female student athletes on the women's softball team to a safe and secure educational environment, thus materially impairing Plaintiff's ability to participate in and benefit from the activities of SJU, and denied them access to educational benefits and opportunities on the basis of gender, in violation of the requirements of Title IX.

108. As a direct and proximate cause of Defendants' unlawful actions including violations of Title IX, Plaintiff is entitled to actual and compensatory damages in an amount to be determined

by a jury.

109. SJU, through its employees and administrators including but not limited to the women's softball coaching staff, had actual knowledge of the discrimination and harassment being perpetrated upon members of the softball team and, at times, participated in such misconduct.

110. SJU violated Title IX by, *inter alia*:

a.    failing to take immediate and appropriate action over a course of years to investigate or otherwise determine what occurred with regard to known harassment and hazing on the women's softball team, or, being deliberately indifferent thereto;

b.    failing to take prompt and effective steps to end the sexual violence, sexual harassment and other misconduct and failed to prevent its recurrence or address its effects;

c.    failing to provide adequate academic assistive services, health, psychological, counseling and other services to Plaintiff and other members of the women's softball team immediately after learning of misconduct on the softball of a sexual nature resulting in a hostile environment; or, alternatively, being deliberately indifferent thereto;

d.    failing to discipline employees who knew of the misconduct described in this Complaint but turned a blind eye to such misconduct;

e.    failing to discipline employees who knew of the misconduct described in this Complaint and participated in such misconduct;

f.    allowing Plaintiff access to education and activities to be restricted through sexual

harassment and discrimination, or, alternatively, being deliberately indifferent thereto;

g.   effectively denying Plaintiff an opportunity to continue to attend SJU based on the discrimination and harassment she endured at SJU creating a hostile environment making continuing her education at SJU untenable; and

h.   through other actions, inactions, and deliberate indifference.

111.   The actions of the Defendants at issue in this Complaint were willful, deliberate, and malicious, thereby entitling Plaintiff to an award of punitive damages in an amount to be determined by a jury.

## COUNT II
## RETALIATION UNDER TITLE IX OF THE EDUCATION AMENDMENTS OF 1972

112.   The foregoing and subsequent paragraphs are incorporated by reference as though set forth at length.

113.   Title IX prohibits an educational institution from retaliating against an individual or individual(s) because they have complained about sex discrimination under Title IX. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005).

114.   SJU retaliated against Plaintiff for engaging in protected activities, namely, for raising awareness of the culture of sexual harassment through hazing experienced by her and other students at SJU.

115.   SJU, by and through its coaching staff, intimidated and threatened Plaintiff on account of her having exercised her rights under Title IX by attempting to raise awareness of the sexually

based harassment and willfully ignored complaints of sexual harassment as a punishment to Plaintiff and similarly situated student athletes.

116. Plaintiff is entitled to recover damages from Defendants proximately resulting from their acts of retaliation including compensatory damages.

**COUNT III**
**NEGLIGENCE**

117. The foregoing and subsequent paragraphs are incorporated by reference as though set forth at length.

118. Defendants each owed duties to Plaintiff and breached those duties resulting in harm to Plaintiff.

119. Defendants failed to inform Plaintiff of the actual culture of the SJU softball team during the recruiting process and misled Plaintiff by giving her false assurances and false information which Plaintiff relied upon to her detriment.

120. Defendants failed to train and supervise their subordinates to properly perform their job responsibilities.

121. Once Plaintiff matriculated at SJU, Defendants further breached their duties by failing to act appropriately under the circumstances as described in this Complaint.

122. Plaintiff suffered damages as a result of Defendants' negligence.

**COUNT IV**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

123. The foregoing and subsequent paragraphs are incorporated by reference as though set forth at length.

124. Defendants' misconduct in this case is so outrageous in character and so extreme in degree that it is beyond all possible bounds of decency, and should be regarded as atrocious, and utterly intolerable in civilized society.

125. Plaintiff suffered emotional distress as a direct and proximate result of the Defendants' misconduct.

126. Plaintiff was injured by Defendants' misconduct as aforesaid.

**COUNT V**
**BREACH OF CONTRACT**

127. The foregoing and subsequent paragraphs are incorporated by reference as though set forth at length.

128. Defendants formed a contract with Plaintiff as embodied in the Student Handbook and the other policies and procedures of SJU as well as the oral promises used to induce Plaintiff to attend SJU.

129. Defendants breached their contract with Plaintiff by failing to enforce their own policies, failing to investigate known or suspected (including repeated) violations of the policies and failing to protect the welfare and well being of Plaintiff despite promises to do so.

130. Defendants' breaches of contract foreseeably caused Plaintiff harm including the emotional, psychological and physical harm alleged in this complaint.

## COUNT VI
## PROMISSORY ESTOPPEL

131. The foregoing and subsequent paragraphs are incorporated by reference as though set forth at length.

132. This Count is pled in the alternative to the Breach of Contract Count.

133. SJU's promises and representations to Plaintiff were false and misleading and resulted in the damage to the Plaintiff as aforesaid.

134. Said promises and representations were material in that, *inter alia*, Plaintiff relied to her detriment upon same and established and accepted a scholarship and attended SJU in reliance upon same.

135. Plaintiff justifiably relied upon Defendants' promises to her detriment causing damages.

## COUNT VII
## Unfair Trade Practices and Consumer Protection Law ("UTPCPL")
### *Plaintiff v. SJU*

136. Plaintiff incorporates by reference all of the foregoing and subsequent paragraphs as though fully set forth at length herein.

137. SJU engaged in unfair methods of competition and/or unfair or deceptive acts or practices in violation of the Unfair Trade Practices and Consumer Protection Law 73 Pa. C.S.A § 201-1 et seq. ("UTPCPL").

138. The Unfair Trade Practices and Consumer Protection Law ("UTPCPL") was designed to promote full disclosure of information to consumers and to equalize market position and strength of the consumer *vis-a-vis* the seller.

139. In that regard, the UTPCPL requires an expansive reading which reaches unfair and

deceptive practices in all consumer transactions.

140.    SJU is a "person" as defined pursuant to 73 Pa. C.S.A. §201-2 and is engaged in trade or commerce as defined pursuant to 73 Pa. C. S. A §201-2.

141.    Plaintiff was a "purchaser" within the meaning of Section 201-9.2 of the UTPCPL.

142.    Defendants specifically intended Plaintiff to rely upon their words and conduct as set forth in this Complaint to recruit Plaintiff to SJU as a softball player and to have her remain at SJU.

143.    Plaintiff's reasonable reliance was specifically foreseeable.

144.    SJU's services were primarily for personal, family or household purposes of Plaintiff within the meaning the UTPCPL.

145.    SJU engaged in unfair and/or deceptive trade practices under the UTPCPL, including but not limited to:

    a.    Representing that the goods or services supplied by Defendants had characteristics, ingredients, uses and benefits that they did not have by, *inter alia*, representing that (1) SJU promoted Christian values and upheld the dignity of all attendees and (2) the softball team was a values oriented team where Plaintiff would be safe, secure and looked after by the coaching staff; when it was known that harassment, intimidation, sexual abuse, and violations of many university policies were tolerated on the softball team, by the coaches of the softball team and by the administration; See 73 P.S. 201-2(4)(v);

    b.    Representing that services supplied were of a particular standard, quality or grade when they were of another as set forth above. See 73 P.S. 201-2(4)(vii);

47

c.    Advertising goods or services with intent not to sell them as advertised. See 73 P.S. 201-2(4)(ix);

d.    Failing to comply with the terms of the written guarantee/warranties as stated in the Student Handbook.

e.    Engaging in fraudulent and/or deceptive conduct which created a likelihood of confusion or of misunderstanding as set forth herein including informing Plaintiff that the SJU softball team was a wholesome well functioning team when in fact it was not. See 73 P.S. 201-2(4)(xxi).

146.    Plaintiff was injured by Defendants' violations of the UTPCPL.

**RELIEF REQUESTED**:

**WHEREFORE**, Plaintiff requests the following equitable and legal relief:

a.    That the Court declare that Defendants' actions, policies, and practices complained of herein violated Plaintiff's rights under Title IX of the Education Amendments of 1972;

b.    Injunctive relief requiring Defendant SJU to take effective steps to prevent sex-based discrimination, harassment and/or violence creating of a hostile environment in its education and athletic programs; fully investigate suspected incidents of such misconduct; appropriately respond to all such misconduct; and mitigate the effects of such misconduct by eliminating any hostile environment that may arise from or contribute to it.

c.    That Defendants be permanently enjoined from violating the rights of Plaintiff and others under Title IX of the Education Amendments of 1972;

48

d.     That special damages be awarded to compensate Plaintiff for economic injuries as a consequence of Defendants' violations of their rights in an amount to be determined by a jury;

e.     That compensatory damages be awarded against Defendants to compensate Plaintiff for all compensable injuries including, but not limited to, her pain and suffering, mental and emotional distress, anxiety, humiliation, outrage, damage to reputation and payment of all expenses incurred by her or her family (on her behalf) in response to these circumstances;

f.     That punitive damages be awarded against Defendants in an amount to be determined by the enlightened conscience of the jury to deter Defendants from similar misconduct in the future;

g.     That a trial by jury be had on all issues wherein a jury trial is permitted under law;

h.     That attorneys' fees and expenses of litigation be awarded;

i.     That prejudgment and post-judgment interest be awarded; and,

j.     That the Court award such other equitable or monetary relief as deemed just and proper under the circumstances.

**JOKELSON LAW GROUP, P.C.**

By:  Derek E. Jokelson, Esquire
David E. Jokelson, Esquire
230 S. Broad Street, 10th Floor
Philadelphia, Pa. 19102
(215) 735-7556

*Attorneys for Plaintiff*

49